CINCINNATI GAS & ELECTRIC COMPANY, Application of, In re.

Public Utilities Commission.

No. 27749.   Decided April 15, 1960.

*Messrs. Peck, Shaffer & Williams*, by *Mr. Water E. Beckjord* and *Mr. Richard H. Rhein*, for The Cincinnati Gas & Electric Company, applicant.

*Mr. C. Watson Hover*, prosecuting attorney, by *Mr. Robert Owen Lilley*, assistant prosecuting attorney, for the County of Hamilton, Protestant.

*Mr. Mark McElroy*, attorney general, by *Messrs. Herbert T. Maher* and *Andrew R. Sarisky*, assistant attorneys general, for The Public Utilities Commission of Ohio.

## FINDINGS AND ORDER

The Commission coming now to consider the above-entitled Application, the exhibits attached thereto and made a part thereof, the matters contained in the Report of the Secretary issued pursuant to Section 4909.19, Revised Code, the testimony and exhibits adduced at public hearings held on September 29, 1959, October 21, 22, 23, 26, 27, 28, 1959, November 23, 24, 25, 1959, and January 18, 19, 20, 21, 28 and 29, 1960, and being otherwise fully advised in the premises and in compliance with Section 4903.09, Revised Code, hereby renders its Findings and Order.

### NATURE OF THE PROCEEDING:

By this Application, filed by The Cincinnati Gas & Electric Company pursuant to Section 4909.18, Revised Code, the Applicant seeks authority to increase certain of its electric rates and charges for residential service and small general service (termed "commercial") in the unincorporated areas in the Company's service area and for large general service and primary service (termed as "large commercial" and "industrial," respectively) throughout its service area, including the incorporated areas except those comprising the Cities of Cincinnati, Norwood and St. Bernard wherein such latter rates are fixed by ordinance contract.

### HISTORY OF THE PROCEEDINGS:

On April 21, 1958, the Cincinnati Gas & Electric Company filed with the Commission the aforesaid Application seeking authorization to change, simplify and generally increase certain of its rates and charges for electric service as above indicated.

On April 21, 1958, concurrently with the Application, Applicant filed a Motion for an Order from this Commission:

1. Ordering that exhibits A., B., & C., as listed in the Application and tendered for filing therewith, be filed in duplicate in lieu of the exhibits referred to under items (A), (B) and (C) of said Section 4909.18, Revised Code; and,

2. Approving the form of legal notice, Exhibit I, pursuant to the provisions of said Section 4909.19, Revised Code.

On June 19, 1959, the Commission issued its Order on the above Motion, which Order (1) dismissed the first branch of Applicant's Motion for the reason that Exhibits B and C constitute a detailed inventory and appraisal as specified in paragraph (A) of Section 4909.18, Revised Code, and Exhibit C accords with the exhibits prescribed by paragraphs (B) and (C) of said Section and (2) granted the second branch of the Motion by approving the proposed form of legal notice as required by said Section 4909.19, Revised Code. A copy of this Order was served the same date on the Applicant by certified mail, return receipt requested.

On June 30, 1959, the Report of the Secretary was filed with the Commission and, as provided by law, copies of said Report were served by certified mail, return receipt requested, upon the persons specified in the Report, namely the Applicant and the Mayors and County Prosecuting Attorneys in the area affected by the Application in this matter. Copies of the Report were also served by regular mail upon other interested persons.

On July 27, 1959, objections to the Report were filed in behalf of Hamilton County, Ohio, by the Prosecuting Attorney thereof.

On July 29, 1959, objections to the Secretary's Report were filed by Applicant.

On September 4, 1959, the Commission issued its Entry assigning this matter for public hearing on Tuesday, September 29, 1959, at 10:00 A. M., E. S. T., in the offices of the Commission. The Entry reserved, also, the dates of September 30, October 1 and 2, 1959, for further hearings in this matter in the event it became necessary. On the same date copies of this Entry were served by certified mail, return receipt requested, upon the persons specified in the Secretary's Report, namely the Applicant and the Mayors and County Prosecuting Attorneys in the area affected by the Application in this matter. Copies thereof were sent also by regular mail to other interested parties.

On September 19, 1959, Applicant filed the following exhibits;

Written testimony of Mr. C. Lindell in re Value of Land.

Written testimony of Mr. C. M. Turner, Volume I, including the following exhibits:

Exhibit 1—Certification of Notice of Publication.

Exhibit 2—Map of Company's electric service area.

Exhibit 3—Present and Proposed Revenues as Affected by Application.

Exhibit 4—Comparison of Cost of Living with Average Price of Residential Service.

Exhibit 5—Comparison of Wholesale Price Index with Average Price of Commercial and Industrial Service.

Exhibit 6—Statement of Plant in Service, Operating Statement, and Rate of Return.

Written testimony of Mr. H. W. Keller, including Exhibit 7—Major Allocation Factors.

Written testimony of M. J. Doan, including Exhibit 8—Operating Statement, and Exhibit 14—Working Capital.

Written testimony of Mr. E. S. Fields, including Exhibit 15—Unit No. 4, Walter C. Beckjord Station.

Written testimony of Mr. E. H. Mitsch, including Exhibit 16—Comparison of Various Operating Data concerning Generating Unit No. 4, at W. C. Beckjord Station.

Written testimony of Mr. H. G. Eilers, with reference to separate volumes on Exhibits 17, 18 and 19.

Mr. H. G. Eilers, Exhibit 17—Plant Valuation.

Mr. H. G. Eilers, Exhibit 18—Original Cost and Original Cost Trended of Aged Survivors (including Handy-Whitman tables).

Written testimony of Mr. N. A. Lougee, Part I—Existing Depreciation and Part II—Depreciation Accruals, including Exhibit 20—Life and Reserve Requirement Curves, Exhibit 21—Existing Depreciation, and Exhibit 22—Depreciation Accrual.

Written testimony of Dr. H. B. Dorau in re Normalization of the Accounting Charge for Deferred Taxes.

Written testimony and Exhibit 23 of Dr. H. B. Dorau Re a Fair Rate of Return.

Written testimony Vol. II of Mr. C. M. Turner, including

Exhibit 24—Rate Groups of Cities and Unincorporated Areas, and Exhibit 25—Graphic Relationships of Present and Proposed Classes of Service.

On September 29, 1959, October 21, 22, 23, 26, 27, 28, 1959, November 23, 24, 25, 1959, and January 18, 19, 20, 21, 28 and 29, 1960, public hearings were held at the offices of the Commission, 65 South Front Street, Columbus, Ohio.

*COMMISSION'S DISCUSSION:*

### 1. *Statutory Rate Base*

The Applicant, The Cincinnati Gas & Electric Company, submitted a reproduction cost new (RCN) appraisal of its plant and property used and useful in the rendition of electric service as of December 31, 1957, to its consumers affected by the Application. The appraised valuation of the utility plant and property submitted purported to cover the electric property used to render (1) residential service in suburban unincorporated areas of the Company's service area, (2) small general service (termed "commercial") in the unincorporated territories of its service area, and (3) large general service and primary service (termed "large commercial" and "industrial") throughout the Company's service area, including the incorporated areas except those comprising the Cities of Cincinnati, Norwood and St. Bernard wherein the latter large general and primary service rates were fixed by ordinance contract.

The reproduction cost new Appraisal constituted, in substance, (1) the original cost of land and land rights as recorded and capitalized on the Company's books, (2) a trended original cost valuation of all of the property (exclusive of land and land rights) of the Company's Electric Department, including the common and general property, and (3) an allocation of such aggregate utility plant to that property allegedly used to serve the consumers affected by the Application as above-described. This allocated Appraisal, as submitted initially by Applicant, proposed a valuation totalling $201,456,058. *See* Company Exhibits Nos. 7, 7-A, 17, 17-A, 18 and 19; R. 182, 413-436, 493-516.

Examination by the Commission and its counsel disclosed that said allocated reproduction cost new Appraisal included property utilized to serve the residential and small general service consumers in some 66 municipalities which had enacted and

effectuated extant ordinances, allegedly on a contractual basis, establishing rates for such residential and small general services (R. 595-650). Hence, the property valuation appraisal as proposed by the Company, and as substantially accepted by the Commission's engineers, encompassed property devoted to the rendition of certain electric utility services which were not covered by the Company's Application and, moreover, which were not subject to the Commission's jurisdiction in the instant rate proceeding. *See* R. 816-893.

The Commission's counsel requested and the Assistant Prosecuting Attorney for Hamilton County moved that Applicant be required to allocate further its property, revenues and expenses to conform to the jurisdictional rates involved in this proceeding. Upon consideration of the request, the Motion, and the arguments made thereon, the Commission granted said request and Motion, and required Applicant to submit additional exhibitive data reflecting the elimination of aforesaid property from the allocated valuation. R.-900.

The Company thereafter submitted a new allocated reproduction cost new Appraisal with an aggregate valuation of $124,797,008. *See* Company Exhibit 8-A, 12-R and Company Exhibit 17-A, 1-R.

The price and cost indexes proposed and employed by the Company in making its valuation estimate were adopted by the Commission's engineers. In the opinion of the staff engineers, after a study thereof, these indexes were acceptable and reasonable for the purposes utilized in this proceeding. The trending factors derived from those indexes were then applied to the surviving dollars in each account by the Commission's engineers in the same manner as done by the Company to reach an estimate of the December 31, 1957 valuation of the dollars by year of installation as recorded in the Company's property accounts and assignable to the electric plant and property allocated to the service encompassed by the Application. Employing the same general method of allocation and like allocation factors as employed by Applicant, the Commission's engineers derived an allocated RCN appraisal of $124,537,286.

The primary differential between the Company's proposed

RCN appraisal estimate and that developed by the Commission's engineering staff is the procedure employed in deducting the so-called "Contributions in Aid of Construction." *See* page 6, Section VIII of Staff Engineering Report, as incorporated in the Report of Secretary, Commission Exhibit No. J.

While the Commission is of the opinion that the reproduction cost new valuation of Applicant's plant allocable to the electric services subject to the Application is that estimated by the Commission's engineering staff, namely $124,537,286, both this appraisal estimate and that submitted by the Company includes the allocable portion of Unit No. 4 of the W. C. Beckjord Station which was first put into partial service on May 10, 1958—about 4½ months *after* the date certain herein of December 31, 1957. Applicant's witnesses testified that the completion of this No. 4 turbo-generator unit was delayed by strikes and other difficulties which precluded meeting its scheduled "in service" date of December 1, 1957. By reason of regulatory lag and alleged attrition, the shortage of generation capacity during 1957 which resulted in a purported deficiency of some 90,000 kw., and the necessity to fix utility rates for the future, among other contentions, it is the Company's position that Unit No. 4 should be incorporated within the statutory rate base valuation for purposes of this proceeding. R. 51-56, 108-132. *See* Company Exhibit No. 15.

It would appear that the peak loads of 1957 were not again experienced by the Electric Department of this utility during 1958 or to the time of hearing of this proceeding; and, that the Company's own forecast of required generating capacity would not exceed Applicant's total generating capacity, without implementation of the new 172,000 kw. Unit No. 4, until the middle of the calendar year 1959. However, irrespective of these factual and estimated considerations, the record manifests clearly that said Unit No. 4 and its associated production and transmission facilities were *not* used and useful for the rendition of electric service at the time of the date certain employed for purposes of this rate proceeding. R. 117. The inclusion of property, revenues and expenses, etc., subsequent to an established date is seemingly a matter of regulatory discretion in light of the attendant circumstances; however, it follows that

some termination date must be established for the practicalities of the rate fixing processes. Accordingly, it is the opinion of the Commission that, in view of the facts inherent in this proceeding, said Unit No. 4 of the Walter C. Beckjord Station should be eliminated from the RCN Appraisal herein, and the Commission so finds. Inasmuch as neither the Company's consulting engineers or the Commission's engineering staff assigned any statutory depreciation to this new unit, the allocated portion of said Unit No. 4 may be deducted from the Appraisal without changing the respective estimates of the dollar amount of depreciation and, ergo, without any complications in the arithmetical computations attendant thereto.

Applicant's witness estimates the portion of Unit No. 4 and its associated production and transmission facilities to be allocated for service covered by the Application in the sum of $7,324,642. *See* Company Exhibit No. 17-A. Adopting this allocated sum for this proceeding, the computation is as follows:

|  | *Company Appraisal* | *P. U. C. Engineers' Appraisal* |
|---|---|---|
| Total RCN | | |
| with Unit No. 4 | $124,797,008 | $124,537,286 |
| *Less* Unit No. 4 | 7,324,642 | 7,324,642 |
| Total RCN without | | |
| Unit No. 4 | $117,472,366 | $117,212,644 |

The Commission is of the opinion from the record herein, and so finds, that the RCN Appraisal of the property used and useful for the electric utility services covered by the within Application is $117,212,644 as above indicated.

The next determination to be reached by the Commission with respect to the rate base is the statutory depreciation of the Applicant's property used and useful as above ascertained for this rate proceeding.

The differential between the depreciation estimated by the Company's consulting engineer and that recommended by the Commission's staff engineers represents the substantial differ-

ence between these respective reproduction cost new less depreciation (RCNLD) estimates inasmuch as $12,169,172 of the total differential of $12,428,894 between said RCNLD appraisals is comprised in the dollar estimate of depreciation as corrected and finally submitted by the Commission's engineering staff. The Company's consulting engineer opined a dollar amount of depreciation in the sum of $17,556,507 while the Commission's engineers estimated the dollar depreciation to be $29,725,679. When related to the respective RCN appraisals without Beckjord Unit No. 4, the Company's proposed composite percentage of depreciation results in 14.945% or about 15.0%, and the Commission's engineers' composite percentage is 25.36% or about 25.4%. It is to be noted that the dollar amounts of the respective depreciation estimates are fixed sums irrespective of whether or not the allocated portion of Beckjord Unit No. 4 is deducted from the Appraisals because no depreciation was assigned to this new Unit by either the Company or Commission engineers; hence, the composite percentages of depreciation will vary proportionately depending upon whether or not said Unit No. 4 is included in the Appraisal, thereby rendering said computed composite percentages somewhat illusory. *See* Company Exhibit 17-A and Commission Exhibit L.

It is of significance to consider that over 60% of the total RCN appraisal is reflected in the primary accounts of the Production Plant accounts and, further, that the substantial portion of the differential between the dollar amounts of the respective depreciation estimates is attributable to these Production Plant accounts.

The character and scope of depreciation to be ascertained and deducted from the new reproductive cost for rate-fixing purposes is prescribed statutorily by Paragraph (E) of Section 4909.05, Revised Code:

''(E) Depreciation from the new reproductive cost, as of a date certain, for existing mechanical deterioration, for age, for obsolescence, for lack of utility, or for any other cause, with the percentage and amount of each class of depreciation to be specifically set forth in detail;''

The services of the Company's consulting engineers, N. A. Lougee & Company, as represented at the hearing by witness

Norman A. Lougee, were secured to undertake investigations and studies from which to submit opinions as to both the "existing depreciation" and the annual accrual rates for depreciation of the Company's Electric and Common properties. R. 137. The witness testified that over 30 man-days were spent in the field inspecting most of the Company's facilities during the latter part of 1957 and the first part of 1958. R. 147-148. The depreciation accrual study was largely a matter of computation and judgment which was effected largely by office methods. *See* Company Exhibit 20. R. 138-145.

The Company's depreciation witness testified to the composite percentage depreciation found for each primary account of the various types of property and to the various classes or factors of depreciation estimated for the aggregate composite depreciation percentages estimated for the Production, Transmission, General and Common, and Distribution plant classifications. R. 149-160. The witness summarized that he estimated the "existing depreciation" to be a total composite of 15.3% (84.7 per cent condition) of which he estimated mechanical deterioration to constitute 9.8%, obsolescence 5.4%, and lack of utility or inadequacy 0.1%. The witness added that the total Electric Plant in service, plus the Common Plant in service, yielded an estimated depreciation of 15.2% and a per cent condition of 84.8%. R. 160. *See* written testimony and exhibitive data contained in Company Exhibit No. 21.

Company Exhibit No. 21, as prepared and sponsored by Witness Lougee for summarizing his estimates of "existing depreciation," does not specifically set forth in detail the percentage and amount of each class of depreciation as prescribed by above-quoted Paragraph (E) of Section 4909.05, Revised Code. As indicated, this witness did effect such a breakdown of the percentages for each class of depreciation in his written and oral testimony with respect to the major classifications of the plant accounts, that is, Production, Transmission, Distribution and General Plant. R. 150-160. For the primary accounts of Production Plant, witness Lougee estimated a composite percentage depreciation for the three generating stations, treating each of the production plants as an entity, and then, admittedly "working backwards," allocated a percentage

depreciation to each of the primary accounts classified within the Production Plant by the relative age of the dollars in said accounts of each station. R. 964-969. In this regard the witness stated on cross-examination:

"... we obtained first a percent condition for the power station based on its relative efficiency compared to a brand new modern station, and taking into consideration the way the station has been maintained, and then broke that down, the total figure, into the respective accounts in accordance with the average age of the accounts." R. 964-965.

Hence, the composite percentage of depreciation assigned to each primary account in the Production Plant, as set forth in Table 1 of Company Exhibit No. 21, has no significance and such percentages, as acknowledged by witness Lougee, are of no import whatsoever and fail to "... serve any useful purpose." R. 967. It follows, accordingly, that any breakdown of these same composite percentages of depreciation into classes of depreciation would fail likewise to serve any useful purpose. In fact, the witness stated that he did not attempt to break down the composite percentage of depreciation for the Production Plant primary accounts into the various classes or factors of depreciation. R. 1002.

The percentage of depreciation for the primary accounts of the Transmission Plant were seemingly considered on an individual basis and, except for the Underground Conduit and Underground Conductors & Devices Accounts, were subject to a field study by the staff of the Company's consulting engineers. The composite percentage of depreciation, however, assigned to the total Transmission Plant was acknowledged by witness Lougee to be a judgment estimate as is the percentage breakdown thereof into the respective classes of depreciation. R. 1019-1019A, 1020-1021. The record evinces that substantially the same methodology was utilized by the Company's consulting Engineers in reaching the percentage estimate of depreciation for the Distribution Plant and the property recorded by the primary accounts thereof.

Witness Lougee maintained on cross-examination that the so-called "existing depreciation," as he construed and understood this term of art, could not be estimated on any age-life

ratio as was done for the estimation of the annual accrual rates for depreciation. R. 960-961. He stressed that the per cent condition of property as of a date certain does not and should not reflect future obsolescence, inadequacy or lack of utility, demands of public authority, etc., because such causes of property retirement do not occur on a uniform basis and, while subject to engineering estimates, are allegedly not fixed facts. The witness contended that only known and observable factors of depreciation can be considered in reaching an estimate of property's percentage of depreciation or, conversely, its present per cent condition. R. 799.

Cross-examination of the Company's depreciation witness manifested that in estimating the depreciation of some accounts either the age of the dollars in such primary account or the physical age of the property proved a factor in his determinations (R. 774-775, 782-783); that the Company's prior experience as to retirements in certain property accounts was appropriate to be considered in estimating so-called "existing depreciation" (R. 784-786), that 75% of property retirements are attributable to obsolescence (R. 948-950) or, as later modified by the witness, are due to obsolescence and inadequacy (lack of utility) (R. 188-189), or, as still later modified by the witness, may be attributed to management judgment (R. 1023); that, nonetheless, in his initial estimate of the composite depreciation of 15.3% for the total Electric Plant in Service (without Common Plant) 9.8% was assignable to mechanical deterioration ("wear and tear") and *only* 5.4% to obsolescence and 0.1% to lack of utility (R. 159-160); that, further, of the aggregate composite depreciation of 15.7% assigned by the witness to the three (3) power stations 8.3% was attributable to mechanical deterioration, 7.4% to obsolescence and *nothing* to inadequacy (R. 152 and R. 1060-62) irrespective of his statements as to obsolescence and inadequacy being the primary forces motivating retirements, especially in the Production Plant accounts, and regardless of his observations that the West End power station can not be expanded by addition of new turbo-generator units and that the extant problem of water level experienced at the Miami Fort station precludes additional expansion but which problem is anticipated to be

remedied prospectively by construction of a new dam on the Ohio River (R. 149-152).

There are other seeming inconsistencies and contradictions in this witness's testimony, with respect to his ascertainment of depreciation and his opinions relative thereto, including his view that few, if any, of the factors of depreciation considered in deriving estimates of annual accrual rates for depreciation can or should be considered in the development of estimates of statutory depreciation. The methodology of capitalization utilized by this witness in estimating the depreciation of the Production Plant would appear to the Commission to possess substantive merit as a method of estimating depreciation inherent in production property. R. 969-970. However, the components employed by the witness in this method would not appear to be sustained upon the record herein. R. 972-977. Moreover, it is difficult to accept the witness's premise that this method purportedly incorporates consideration of classes of depreciation other than obsolescence and, possibly, lack of utility, the witness contending that loss of value due to "wear and tear" or mechanical depreciation is reflected in the maintenance costs. R. 982-1000. This conclusion follows, especially, in light of the acknowledgment by the witness that any allocation of the composite depreciation ascertained by this method between obsolescence and mechanical deterioration must necessarily be an arbitrary allocation predicated on engineering judgment (R. 1001-1002) which necessitated "working backwards" from the composite depreciation percentage for the Production to assign either estimates for the respective classes of depreciation or for the various primary accounts within the Production Plant classification. R. 966-967, R. 1005; cf Testimony re Transformers in Transmission Plant, R. 244-248.

Statutory depreciation, as determined by the Commission's engineering staff, is estimated by the composite application of two separate and distinct methods: the "field" method and the "office" method, as they are characterized for purposes of convenience.

The so-called "field" method comprises the traditional procedure by which the engineering staff personnel examine representative samples of all various types of the utility's property

in order to ascertain outward manifestations of depreciation. By this method, the field personnel either assign directly a percentage of depreciation to the units of property inspected or designate the condition thereof as "excellent," "good," "fair," "poor," etc., to which depreciation percentages are correlated, a percentage or percentage band being established for each of these descriptive ratings. A summarization is then made showing the percentage of depreciation for each primary account in the respective Production, Transmission, Distribution and General and Common classification for electric utility property. A weighted average percentage of depreciation predicated upon the appraised dollar valuation of each account is then computed together with the dollar amount of depreciation relative thereto. Broadly speaking, this is the method followed in estimating the depreciation for most accounts, except for the Production Plant accounts, by the staff of the Company's consulting engineers.

The so-called "office" method involves two primary factors: (1) the expected life of each class of property and (2) the attained average age of each class of property. Expected life may be defined in general as the average life of a class of property and in the instant proceeding was derived largely from the estimates utilized by the Company's consulting engineers in developing new annual accrual rates for depreciation. These life estimates are compared by the Commission's staff engineers with comparable property or classes of property to test the reasonableness thereof and, of course, with the Company's historical experience of retirements of that general class or classes of property.

In the instant case, this manner of comparison apparently reflected such estimates to be reasonable inasmuch as the accrual rates proposed by the Company were approved by the Commission's staff engineers.

The ascertainment of the attained average age as of a date certain requires the preparation of tables of the dollar values of surviving assets in each primary account. Usually, as in this proceeding, these tabulations are obtained from the Company. Presumably, these tables show the various ages of the surviving dollars in each of said accounts. These dollar values

for each account by years of installation are then converted to RCN value levels by application of trend multipliers or factors derived from appropriately conceived indexes and the average age of the dollars in each account computed on a weighted basis.

The ratio of attained age to expected life is then ascertained for each class of property. If a particular class of property, for example, has an expected life of 100 years and an average attained age of 40 years, this ratio, termed the per cent life expired, is 40/100 or 40%. This "per cent life expired" for each property account is then related or fitted into a curve called the "average depreciation curve."

In the interest of brevity, this latter curve is derived from other curves, such as the R-2 type curve, computed on the basis of extensive studies conducted by the Iowa Engineering Experiment Station of Iowa State College. Depreciation is then estimated for each primary account by fitting the computed "per cent expired life" into the "average depreciation curve." These respective percentages of depreciation are then averaged with the percentages of "field depreciation" estimated for each property account to obtain the depreciation percentage assignable to each of said accounts. R. 1392-1415, R. 1461-1469.

Applicant, in contesting the foregoing methods utilized by the Commission's staff in estimating statutory depreciation, contended that the procedures were not properly applied, that the "office" method was inappropriately conceived and failed generally to reflect extant depreciation. It is to be noted that Applicant's criticisms were directed largely at the statutory depreciation estimated by the Commission's engineers for the primary accounts in the Production Plant wherein most of the differential between the Company's and the Commission's engineer's estimates is reflected. It would appear such criticism is obviated for the most part by the fact that the Commission's engineer's aggregate estimate of depreciation obtained through the "field" study for said Production Plant accounts is higher than that obtained from the "office" method; and, of course when the former is averaged with the lower estimate derived from the latter "office" method, a composite percentage depreciation results which is lower than that ascertained by use of the "field" method alone. Applicant's further contention that

the Commission's engineer's field method for the Production Plant allegedly gave undue weight to the age of the property inspected would appear clearly not to be supported upon the record.

The Commission recognizes that depreciation estimates predicated upon engineering judgment may differ to substantial degrees as to the amounts of depreciation inherent in property. Frailities of varying character and scope may well be manifested in the respective estimates of statutory depreciation propounded upon this record. The recommendations submitted by the Commission's staff are subject to the same analysis as the testimony and exhibits proposed by applicant utilities and by protestants. From these analyses it is the duty of the Commission, as a fact finding body, to draw inferences from the recorded evidence and reach the requisite conclusions of fact.

It is the opinion of the Commission, and it so finds, that the composite dollar amount for depreciation of this Applicant's depreciable property used and useful for the services covered by the within Application is in the sum of $29,725,679 and that the components of this composite depreciation estimate accords with the statutory prescriptions of Par. (E) of aforecited Section 4909.05, Revised Code. *See* Commission Exhibits J. K. and L. Arithmetically, this dollar depreciation results in a computed percentage of depreciation of 25.36%, as indicated heretofore.

Deduction of this dollar depreciation of $29,725,679 from the previously ascertained RCN Appraisal of $117,212,644 results in an amount of $87,486,965 which the Commission finds to be the reproduction cost new less depreciation (RCNLD), without the Beckjord Unit No. 4, of Applicant's plant and property used and useful in the rendition of the electric utility services covered by this Application. This latter sum accords with the RCNLD estimate, as corrected, submitted by the Commission's engineering staff in the sum of $94,811,607 which included the undepreciated allocable portion of said new Beckjord Unit No. 4. *See* Commission Exhibit L.

*Working Capital Allowances*

The final determination to be made by the Commission in

arriving at the total valuation of the statutory rate base in this proceeding is the proper amount of working capital to be added to the above determined reproduction cost new less depreciation valuation of Applicant's plant and property.

Applicant proposed that the aggregate allowance for working capital, after elimination of Beckjord Unit No. 4, should be in the sum of $4,001,116. Commission Exhibit I, Section 2, p. 1. This figure was estimated as follows:

| | |
|---|---:|
| One-eighth of operating expenses | $1,130,911 |
| One-twenty-fourth of electricity purchased and interchanged | 3,555 |
| Materials and Supplies: | |
| Other than Fuel | 777,980 |
| Fuel | 1,452,265 |
| Prepayment | 118,897 |
| Minimum bank balances | 517,508 |
| Total | $4,001,116 |

The Commission's Engineering Staff recommended that no allowance for working capital be included in the rate base on the ground that the estimated amount necessary for working capital was more than offset by the funds computed as available from tax accruals. Commission Exhibit J, Engineering Section VI, pp. 4-5. The Staff agreed with the Company's proposed allowance of one-eighth of operating expenses and one-twenty-fourth of electricity purchased and interchanged; they substantially reduced the allowance for material and supplies other than fuel by allowing only those items reflected in expense accounts and increased the fuel allowance; the Staff accepted the Company's prepayment estimates but eliminated the proposed allowance for minimum bank balances on the basis that this allowance was not a proper component of the rate base.

Upon consideration of all of the facts of record in this proceeding, including the views and calculations of both the Company and the Staff, the Commission is of the opinion, and so finds, that the proper allowance for working capital to be

added to the reproduction cost new less depreciation valuation of Applicant's property is $686,835, computed as follows:

| | |
|---|---:|
| One-eighth of adjusted operating expenses | $1,102,784 |
| One-twenty-fourth of electricity purchased and interchanged | 3,555 |
| Materials and Supplies (including fuel) | 2,230,245 |
| Sub-total | $3,336,584 |
| *Less*: Funds available from tax accruals | 2,649,749 |
| Net Working Capital Allowance | $ 686,835 |

It is to be noted that this accords with the Commission's finding in the joined rate proceedings in the Columbus and Southern cases, Nos. 28,192 and 28,338 on the Commission's docket, in which the Company's estimates for cash working capital and materials and supplies were essentially accepted and a comparably computed deduction made for funds available from tax accruals.

In the instant case the Company claimed additional allowances for prepayments and minimum bank balances. The Commission is of the opinion that Applicant has failed to sustain these additional claimed allowances upon the record herein and it finds, accordingly, that these proposed allowances should be denied.

*Statutory Rate Base*

The aggregate valuation of the statutory rate base herein is the sum of the reproduction cost new less depreciation of $87,486,965 plus the allowances for working capital of $686,835, or a total valuation of $88,173,800, which sum of $88,173,800 the Commission finds is the Statutory Rate Base for purposes of this rate proceeding.

2. *TREATMENT OF ACCELERATED DEPRECIATION*

In the Commission's recent finding and order in the joined rate proceedings of the Columbus and Southern Ohio Electric Company Cases Nos. 28,192 and 28,338, the Commission discussed the difficulty of deciding how to treat the reduction in

Federal Income Taxes growing out of the use by utilities of accelerated depreciation.

The Commission is aware that there are advantages to utilities and consumers alike in being able to look to a settled policy on a matter which involves substantial amounts of money. Depending on the final decision, consumers, including industrial consumers, may anticipate that savings in Federal Income Tax liability will be reflected in consumer rates or, instead, the utility itself may count on the savings as a source of interest-free capital for the financing of further improvements to plant, or, indeed, shareholders may anticipate greater income.

The discussion in the Columbus and Southern Ohio Electric Company Order, however; continues to reflect the view of this Commission. The conclusion there was:

"Presently, there appears to be no consensus that may be used properly as a guidepost, but only a series of widely divergent opinions and policies. The Commission is of the opinion that this vital matter requires substantially more study, and consideration, and even experience, before the Commission may establish its final policy."

Accordingly the Commission for the purposes of the instant proceedings has given similar treatment to this issue as was given in the Columbus and Southern Ohio Electric Company cases. Here, as in those proceedings, ". . . normalization of Federal Income Taxes will be allowed and no deduction will be made from the rate base. Rather, the Commission will, for purposes of these proceedings, give appropriate consideration to the fact that the amounts in the 'Reserve for Future Federal Income Taxes' are a source of interest-free capital in determining the fair rate or rates of return to this Company."

### 3. Rate of Return

In Section 1 of this Order, the Commission's finding as to the statutory rate base has been set forth. The next step is to ascertain what percentage will represent a fair annual rate of return. Obviously this factor in the rate formula prescribed by law is equally determinative as the rate base in reaching the ultimate regulatory objective of reasonable compensation for the services covered by this Application.

Rate of Return is a figure. There is no statutory pro-

nouncement as to the determination of this figure. There is no generally accepted precise method of arithmetically computing this figure. This follows especially because the determination of this percentage return is a matter of informed judgment.

The only witness on rate of return in this proceeding was the Company's witness who estimated a judgment rate of return of 6.25. Briefly stated, through a series of judgments, this witness opined this Company's cost of capital, expressed as a percentage, to be not less than 6.00 to which, through application of further judgment factors, he added an allowance of .25 resulting in a rate of return figure of 6.25.

The witness' judgments and conclusions must be rejected by this Commission for they would lead to seemingly absurd results. Application of his estimate of 6.25 to the statutory rate base found by the Commission would result in a rate increase of $750,000 *more* than the Company is requesting. Application of his figure of 6.25 to the rate base claimed by the Company would result in a rate increase of $3,250,000 *more* than the Company is requesting.

The case of *Bluefield Waterworks and Improvement Company* v. *Public Service Commission of West Virginia*, 262 U. S., 679 (1923) is cited frequently by representatives for both public utilities and consumers as being the leading case enunciating the principle that regulatory judgment is the determinative actor in establishing a fair rate of return. A pertinent and ft-quoted portion of the decision in this case reads as follows:

"A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties. . . ."

Two divergent views as to the meaning of the foregoing judicial pronouncement are often expressed. One view (literal interpretation taken by representatives of the public) is that the proper rate of return is one that is at the same level when related to comparable bases as that of other business undertakings which are attended by corresponding risks in the same

general part of the country. It follows that, under this view, the rate of return would differ from that being earned by other comparable business undertakings, when related to bases that are substantially different, in inverse proportion to the difference in the bases. Under this view the Applicant in this case would receive no rate increase. The other view (interpretation taken by representatives of public utilities) is in effect that the overall rate of return should be substantially the same as that of other business undertakings attended by corresponding risks regardless of the degree of non-comparability of the bases to which the rate of return figure is to be applied. Under this view the Applicant herein would receive a rate increase approximately twice that which it requested on its own alleged rate base valuation.

The Commission rejects both views. This position is taken in respect to the first view by virtue of a long line of decisions of the Ohio Supreme Court culminating in that decision in the case of *City of Cleveland* v. *Public Utilities Commission of Ohio*, 164 Ohio St., 442. This position is taken as to the second view because (a) it would produce absurd results, (b) the delimiting guidepost of "reasonable compensation" prescribed by the applicable statute, and (c) the recognition by the Supreme Court of this statutory guidepost in the aforecited *City of Cleveland case*, wherein the Court stated as follows through its *per curiam* opinion:

"In determining the rate of return to which this public utility is entitled, consideration may be given to what would be reasonably required to provide for such items as taxes on income, interest on debt, dividends on stock, and a 'reservation * * * for surplus, depreciation, and contingencies' (Section 4909.15, Revised Code), of a company of this kind organized to provide the public with the use of property which is such as this utility provides and which has a value equal to the statutory rate base. Certainly, *to give this public utility more than so reasonably required to provide for such items would be to allow it a higher rate of return than our statutes authorize.* * * *" (Emphasis added.)

After giving due consideration to the evidence and opinions of the Company's rate of return witness and utilizing its own

judgment and experience, the Commission is of the opinion, and so finds, that 5.5% constitutes a fair rate of return.

This rate of return will afford a return sufficient to meet interest on debt, dividends on preferred stock, and approximately 11% rate of return on the statutory common stock equity. In conclusion, the Commission finds that the rate of return will provide Applicant with reasonable compensation to meet such items as taxes on income, interest on debt, dividends on stock, a reservation for surplus, depreciation and contingencies and afford sufficient compensation for the services covered by its Application.

### 4. *Annual Accrual Rates for Depreciation*

On April 21, 1958, concurrent with the filing of the Application for increased rates, Case No. 27,749, the Company also filed an Application docketed as Case No. 27,748 for authority to amend and increase its depreciation accrual rates. The Engineering Staff of the Commission conducted an investigation of the propriety of the proposed accrual rates and on June 22, 1959, submitted a report to the Commission (Commission Exhibit N. in the instant case) recommending approval of the rates proposed by the Company. This report is summarized in Section VII of the Engineering Section of the Secretary's Report in this proceeding, Commission Exhibit J. Based upon these reports and recommendations of its Engineering Staff and upon testimony adduced at the hearings in this case, the Commission is of the opinion that the proposed accrual rates are proper with respect to the property that is involved in this proceeding and, for purposes of this proceeding, the Commission finds such rates should be, and hereby are, approved, even though lower accrual rates in the aggregate were being used by Applicant during the accounting period covered in the Company's Application.

### 5. *Revenues and Expenses*

Revenues and expenses per books allocated to the service covered by this Application are shown on Page 1 of Commission Exhibit I. They may be summarized as follows:

Operating Revenue $19,890,966

| | |
|---|---:|
| Operating Expenses | $ 8,906,689 |
| Depreciation | 1,745,224 |
| Other Federal Taxes | 49,943 |
| State and Other Taxes | 1,508,898 |
| Federal Income Taxes | 3,404,318 |
| Total Expenses | $15,615,072 |
| Return | $ 4,275,894 |

Applicant proposed and effected fourteen adjustments to its per books expenses on Pages 2, 3 and 4 of Commission Exhibit I plus five more adjustments purporting to annualize revenues and expenses to a year-end customer level.

Although a year-end base is being used for purposes of testing rates in this proceeding, the Commission is of the opinion that the great preponderance of commercial and industrial business involved weakens the validity of any attempt to adjust revenues and expenses to a year-end basis under the facts of this case. Further, a number of the adjustments made by the Company involved estimates and other calculated increases and decreases in cost levels occurring from 3 months to a year following the date certain of this case. For these reasons, the Commission is of the opinion and so finds, that the only proper adjustments to the per books expense figures shown on Commission Exhibit I are the following:

(1) An upward adjustment of $61,018 to reflect on an annual basis how much greater costs would have been if wage increases granted during 1957 had been in effect during the entire year of 1957 (Commission Exhibit I, p. 2);

(2) An upward adjustment of $13,778 to reflect as an operating expense one-fifth of the estimated rate case expense less the portion reflected in 1957 actual operating expenses (Commission Exhibit I, p. 2);

(3) A downward adjustment of $73,794 to reflect the reduction in 1957 operating expenses which would have resulted from the Company charging to construction work in progress an appropriate portion of retirement income plan costs which

practice was inaugurated as of January 1, 1958 (Commission Exhibit I, p. 3);

(4) An upward adjustment of $203,493 in depreciation expense to reflect the higher depreciation accrual rates recommended by Applicant's consulting engineers and by the Commission's Engineering Staff and put into effect by Applicant on July 1, 1958;

(5) A downward adjustment of $17,448 in Federal Income Tax to adjust to the per books figure of $3,386,870 shown on Commission Exhibit E which was prepared by the Company;

(6) A downward adjustment of $30,924 in Federal Income Tax expense to reflect that portion of the difference between the per books figure and the tax actually paid representing "other items" as shown on Commission Exhibit E; and,

(7) A downward adjustment of $427 in Federal Income Tax expenses to reflect the net increase in expenses allowed in adjustments (1), (2) and (3) above.

After these adjustments, revenues, expenses and return at present rates may be summarized as follows:

| | |
|---|---|
| Operating Revenue | $19,890,966 |
| Expenses | 15,770,588 |
| Return | $ 4,120,378 |

This dollar return of $4,120,378 amounts to a rate of return on the statutory rate base valuation of 4.67%. The Commission is of the opinion, and so finds, that this rate of return is insufficient to provide this Company with reasonable compensation for the electric utility services provided by it in the service area under consideration in this proceeding.

The fair rate of return of 5.5%, as determined above, applied to the statutory rate base valuation of $88,173,800 yields an allowable dollar annual return of $4,849,559. This exceeds the dollar annual return of $4,120,378 at present rates by $729,181. To produce this additional return, more than twice as much in additional revenue is required because the state excise tax and P. U. C. O. maintenance tax are directly related

to revenues, and the amount of Federal Income Tax depends on net taxable income. The increase in revenue is thus computed as follows:

| | |
|---|---:|
| Increase in Return | $ 729,181 |
| Increase in State Excise Tax | 47,008 |
| Increase in P. U. C. O. Maintenance Tax | 783 |
| Increase in Federal Income Tax | 789,947 |
| Increase in Revenue | $1,566,919 |

Revenues and expenses at the new higher rates may then be summarized as follows:

| | |
|---|---:|
| Operating Revenue | $21,457,885 |
| Operating Expenses | $ 8,907,511 |
| Depreciation | 1,948,717 |
| Other Federal Taxes | 49,943 |
| State and Other Taxes | 1,556,689 |
| Federal Income Taxes | 4,145,466 |
| Total Expenses | $16,608,326 |
| | $ 4,849,559 |

*ULTIMATE FINDINGS:*

From the evidence adduced upon the record herein, the Commission renders the following Ultimate Findings:

(1) That the Application of The Cincinnati Gas and Electric Company to increase certain of its rates and charges for electric service as set forth therein is filed pursuant to Sections 4909.17, 4909.18 and 4909.19, Revised Code, and that this Commission has jurisdiction thereof;

(2) That the Staff investigation, required by the provisions of said Section 4909.19, Revised Code, has been duly made, and the Report thereof has been filed and served as required by law;

(3) That the statutory rate base valuation of Applicant's property used and useful in supplying such service is $88,-173,800;

(4) That the existing rates and charges for the classes of service under consideration in these proceedings are insufficient to yield reasonable compensation for the service rendered and to provide an adequate annual return on properties of Applicant used and useful in the furnishing of such service;

(5) That the annual rate of return of 5.5% on the above ascertained statutory rate base is fair and reasonable under the facts and circumstances of these proceedings;

(6) That the dollar annual return of $4,849,559 represents a reasonable estimate of the anticipated yearly net compensation to be realized from the electric service that is the subject of this Application;

(7) That the allowable expenses, including taxes and depreciation, are $16,608,326;

(8) That the allowable gross revenues are $21,457,885; and,

(9) That the depreciation accrual rates proposed by the Applicant are reasonable and proper for the purposes of this proceeding.

*ORDER*

It is, therefore

ORDERED, That in accordance with the Opinion and Findings herein set forth, the Applicant, The Cincinnati Gas and Electric Company, be, and the same hereby is, authorized to file with this Commission for its approval, adjusted tariff schedules increasing the rates and charges to consumers in the areas covered by the Application sufficiently to provide a total gross annual revenue of $21,457,885. It is further

ORDERED, That such tariff schedules may become effective subsequent to approval by this Commission or upon such subsequent date as the Commission may designate.

THE PUBLIC UTILITIES COMMISSION OF OHIO

| | |
|---|---|
| Entered in Journal | Edward J. Kenealy, Chairman |
| April 15, 1960 | Frances McGovern |
| A true copy: | Everett H. Krueger, Jr., |
| R. Martin Galvin, Secretary | Commissioners |